Case is 18-5607, 18-5901, and 18-5903 United States of America v. Bryan Bailey, Calvin Bailey, and Sandra Bailey. Argument not to exceed 10 minutes for each defendant and 30 minutes for plaintiff. Mr. Barnett, you may proceed for the first defendant. Good morning. May it please the court, my name is Charles Barnett and I represent Bryan Bailey. I have requested three minutes for rebuttal. In March of 2013, Ronnie Winbush, a paid government informant, picked up the phone and called his cousin, Wanda Wiggins. They had a telephone conversation where they discussed Wanda Wiggins' knee problems, cooking food, a falling out in the Bailey family, and why Wanda had left her mother's house. Into that conversation, Ronnie Winbush tried to lead Wanda Wiggins into making statements about past criminal behavior. A recording of that telephone conversation was the key piece of evidence that was used by the government to convict Bryan Bailey of conspiracy to commit Medicare fraud. The district court erred when it admitted a recording of that conversation under 801 D2E. This court should reverse the district court for two reasons. First, the statements in the recording were not made in furtherance of the conspiracy. And second, the government did not rebut the presumption of unreliability of the co-conspirator's statements with independent evidence. We know that the statements between Wanda Wiggins and Bryan Bailey were not made in furtherance of the conspiracy. First and foremost, because Wanda Wiggins said that she was not working for Sandra Bailey anymore. She had gotten sick and she no longer worked for her. We know that her statements were not made with the intention of furthering the conspiracy because they were all past tense statements. Statements in which she said – in which she agreed with statements from Ronnie Winbush about her involvement with Sandra Bailey and her conspiracy. Under this court's jurisprudence, trial courts look to the intent with which statements are made in order to determine whether or not they were in furtherance of a conspiracy. Here, it's clear that Wanda Wiggins is merely engaging in past declarations of fact, even if those facts happen to be of illegal conduct. Did she testify in the case at all? No, Your Honor. Ronnie Winbush testified in the case. And that's how this recording was introduced, was through the testimony of Ronnie Winbush. And I think it's important to note that if you read the transcript and listen to the audio recording, the majority of the statements come in the form of Ronnie Winbush saying, well, did Sandra Bailey pay you good for knee braces, to which she says, yes. The cadence of the conversation is quite similar to a cross-examination. In all of her statements to Ronnie Winbush, they're all about past events, and the government has to concede that they're past events. And so they focus on this discussion about Wanda's knee and how – and her desire to get a knee brace for what she views as a legitimate medical need. Which the intent behind that is not to further any conspiracy. It's just she is expressing her desire to get a piece of medical equipment for her own benefit. Moving on from the further – Your Honor, all of her future tense statements in the recording are in reference to her desire to get a knee brace for her knee problem. And then there are statements in which she talks about her working for Sandra Bailey, but those statements are all in the past tense. And they are just declarations of past events. They're not said with the intent of furthering a – You read furthering to mean – it can only mean perspective or sort of ongoing, and it can't sort of be admissions or reflections on past efforts of the conspiracy. So, Your Honor, in the United States v. Darwich, this court's noted that just a mere past declaration of criminal activity doesn't – isn't in furtherance. And the test that courts or trial courts should look to in admitting this is one of intent. So you can – a past tense statement can be in furtherance of a conspiracy. But the question is, does the person who is speaking it, are they intending that statement to further the conspiracy? I mean, they could also talk about lots of things. They all might go to some past things. They might go to future things that are unrelated to the conspiracy. But if that person is considered to be part of the conspiracy, and they might take future – I mean, they're still a part of the conspiracy. They might take future actions that help promote the conspiracy or stay a part of it. Your point is not that this person expressly withdrawn from the conspiracy and said, I'm no longer a part of this. She hadn't – in the legal sense, I don't think that she had expressly withdrawn. From her own personal perspective, she was no longer working for the – working for Sandra Bailey. I'm not arguing that she wasn't a member of an alleged conspiracy as a legal fact but as a matter of her personal opinion. Did the government allege that this was an ongoing conspiracy beyond the time of the conversation that was admitted? Yes, Your Honor. They did allege that there was an ongoing conspiracy at the time of the conversation. But I think it's important to note that here it's really – because it's a matter of intent, it's not so much whether or not she was or was not a member of an ongoing conspiracy. It was what was the intent that she made the statements with. And the fact that she said that she's no longer working for Sandra Bailey reflects that she lacks the intent. I see that I've run out of time. Thank you, Your Honor. If it pleases the court, my name is Kenneth P. Tableman. I'm appearing on behalf of Calvin Bailey. I'd like to reserve three minutes for rebuttal, please. This morning I thought I would focus on what I view as the deficient findings of the district court when ruling on my client's objection to the determination of a loss amount. And this requires us to grapple with the relevant conduct guideline. And I will confess it's difficult, but in at least one case the court has said it's counterintuitive. But what I contend happened here is that the district court conflated the concept of criminal liability for a conspiracy with the narrower analysis required under the relevant conduct guideline. As the court has often said, when you're determining loss in a conspiracy for sentencing purposes, we have to use the relevant conduct guideline, which has a commentary, which can oftentimes result in a finding of responsibility in terms of loss. Often these are drug cases, so it will be a lesser quantity of drugs than was involved in the entire conspiracy. It's very counterintuitive. Lawyers are always throwing around the Pinkerton rule and in for a penny, in for a pound and these types of concepts. That's conspiracy law. That's criminal liability. Now, for whatever reason, and I think the reason was there's a distaste for holding someone that, yes, is legally guilty of conspiracy, but in these quantity-driven, loss-driven guideline settings, holding them responsible for everything that happened in the criminal conspiracy when all they agreed to do was this or that within the conspiracy. It's requiring us to consider at the same time competing concepts. Conspiracy law enormously expands liability, a person in for a penny, in for a pound, the relevant conduct. What was the scope of their specific agreement? Is there some difference? And the cases say that there is. It's sometimes hard to determine. It is very hard to determine. One of the reasons we have the broader principle for just criminal liability purposes is once you join a conspiracy, you may not know every single thing the conspiracy is going to do, but you have a general sense of the wrongful conduct it's going to engage in, and you have essentially ceded to that. So how do you go about determining if there is a distinction, which you point to cases that might say there is, but how would the court go about even distinguishing between what Calvin expressly, and I'm not sure how you'd articulate the test, but what he expressly agreed to further as opposed to things that were just furthered without his express consent? I think it's very, very difficult because the words don't, they're hard to reconcile. But if you look at the language, well, let me back up for a second. We have the Donadeo decision, which adopts an analysis about scope, which has a six-factor test and talks about knowledge, what did the person do. But we're trying to figure out, we're grappling with what did the person, what was his specific agreement? What was he or she agreeing to do? Understanding that from a liability standpoint, in terms of being criminally liable, not in terms of loss determination, it's broader. So it is hard. That question was a little unfair because I think your point is that there's a procedural problem here, which is that the district court just applied the wrong test, and so it didn't even engage in this analysis to understand it right. It just fit the broader principle. You're making my argument better than I made it. Because we don't have any of these findings. It's a difficult area. Well, the district court just sort of, I mean, Membership in the conspiracy analysis. Yes. That of some substance. Yes. And I think Mr. Bailey ought to have the chance to have particularized findings about, difficult as they may be, and then this court can review them. But the Donadeo test, which I don't, I mean, I think it's still difficult. I don't think it's like a clear road map. And I think part of the problem is all these fraud cases, all these drug cases, they're all very fact specific. They're all very unique. Even though we try and apply general principles, it's almost a case-by-case approach. You're just wanting to have it remanded for purposes of the sentence. Yes. That's what I want. What sort of difference do you think it would, What would your position be on remand about what the relevant conduct is? The position would be that there's whole areas of this massive series of events over several years that he doesn't know about and doesn't agree to. They may have happened. We may not contest that they happened. But what was he doing? He's a full-time elementary school principal helping his wife out on weekends, driving her here and there once in a while, and two times in 2013, which is way after the fact of the massive amount of loss. We have some things where they say, well, you were driving people here and there. So it's kind of like the guy that goes with somebody and is a lookout for a drug deal or something at the end of a big conspiracy and 50 kilograms were delivered two years before, but all he was doing was a kilogram this month or something. That's kind of the approach that I would take on remand and have the district judge then make some findings. Now we have a six-factor test, and maybe it would turn out the same. I don't know. But we don't know that. The Naito case was decided after this trial? Pardon me? The Naito case was decided? Yes, it was. I'm not wanting to mislead the court and say that that definitively answers everything because some of these – I just don't think the case law is that clear. But let's let the district court start in the first instance and let the district court grapple with it. So that's what I want to focus on this morning. Did you reserve some time for this? I did reserve three minutes. Three. Good morning, Your Honors, and may it please the court. I'm here this morning representing Sandra Bailey, and I'd like to reserve two of my minutes for rebuttal if I may. Your Honors, there are two issues which I'd like to address the court this morning, and they're both related to sentencing. The first is the two-level mass marketing enhancement that was given in this case, and then second, if I have time, I'd like to address the four-point leadership enhancement that was given in this case. As to the mass marketing enhancement, the type of conduct that occurred in this case is not the type of conduct that is envisioned by the commission when it made the mass marketing enhancement. And you can start with the actual language of what this is called, which is mass marketing. And the conduct that occurred in this case was face-to-face marketing that was literally door-to-door marketing between individuals in these small towns. There were actually quite a few people who were touched by the message. Absolutely. In that sense, it might meet the definition of mass. Well, but even if – It wasn't just like two neighbors. No, there were probably either well over 100 people that ended up over the course of this conduct being – Receiving the message. Receiving the message. But the mass marketing enhancement specifically talks about the type of marketing to get a wide number of people using the Internet, television, those type of means of marketing. And it does discuss – it has the caveat other means. But those are other means that are related to that type of conduct. And it's clear, and I kind of set this out in my reply brief, that when the commission made this enhancement back in 1997, they were specifically targeting telemarketing and Internet solicitations. Is that the right line we can draw? Is there electricity involved or electronics? It's mass marketing, and if it's just gumshoe efforts, it's not? Well, there is a line that has to be drawn because it obviously can't involve all marketing, right? So if it was just a marketing enhancement, then there would be no line to be drawn. But obviously there is a line that has to be drawn somewhere. And whether this court wants to say that electricity or electronics have to be involved or not, it's clear that the commission intended it to be that type of marketing that occurred. What if you buy a billboard on Vine Street that says, if you want a wheelchair, call 800? That might be the type of thing that might – because if you take a look – and again, I cited to the Seventh – there's no Sixth Circuit case on this matter yet. The Fifth Circuit has a case or two in there. The Fifth Circuit has a case or two, but the Seventh Circuit does as well. And the Seventh Circuit, which is the Heckle case that I cited to, says that this is about the method used and it's not about the number of people that were actually – got the fraud committed on them. In that case, it was an online internet auction. So it was a wide net of people, but only three people ended up bidding on the product. And so there were only three victims in the case. Now as to the Fifth Circuit cases, Your Honor, I submit that – and I put this in my reply brief – that they don't answer the question in this case because those cases only dealt with whether you could apply this enhancement for co-conspirator liability. In other words, the only issue that was raised by either appellant in that case was, I didn't do the mass marketing. My co-defendant did. This shouldn't apply to me. And that was the holding of both the MassCur and that Iswal case was on co-conspirator liability. Now the Fifth Circuit did mention in passing that face-to-face marketing could count, but that wasn't the issue raised in either of those cases. And so at best, that's dicta. And so you have this dicta by the Fifth Circuit on something that was never fleshed out by the litigants in the Fifth Circuit that says this. We're now to the point where this is preserved and we're actually fleshing this out in this case as to whether this type of face-to-face conduct can actually qualify for mass marketing in this case. And I think, again, no better reference than what other things the Commission said this applies to, telemarketing, Internet, those type of things. The guideline commentary also says, or other means to induce a large number of persons to purchase goods or services. So the guidelines themselves don't rule out the possibility that there could be other methodology that would constitute mass marketing. I agree. And our point is that it should be other means, but it's not any means. And there has to be a line drawn somewhere in clearly face-to-face conversations where you're having six people in a living room that are listening to a sales pitch is not the type of mass marketing that qualifies for this enhancement in this case. Bailey didn't just meet with six people in a room. She used people to give her referrals, and the total of those referrals would be pretty substantial, correct? It was. If you take a look at the I mean, like hundreds, right? If you look at all of the solicitations, it got into the hundreds. But, again, this is what differentiates this from, let's say, an Internet solicitation, which an Internet solicitation is going to take you to thousands and maybe hundreds of thousands of people on one solicitation. What we're talking about is six at a time over years and years and years that get us to those hundreds, and that's not mass marketing. The Tenth Circuit, in a case called, I don't know, for debt maybe, has said that the enhancement for mass marketing concerns the scope and sophistication of the defendant's fraud. That sort of takes you away from the notion that it's just the Internet or it's just mail or it's just phone or whatever it is, right? I agree that that, yes, the Tenth Circuit did. That's where they held. We think the Seventh Circuit has a better argument because the Seventh Circuit is grounded on the original commentary from 2F1.1 back in 1997, which is the best evidence of what the commission intended. I have a minute left. I would like to discuss my leadership enhancement, if I may. Are you still making the point about the fraud having to be directed at the victim as opposed to solicitors? I'm not conceding it, but I didn't want to spend my last minute on it. But I would say that the Fifth Circuit case talks to that and goes the opposite direction on that as well. With the 3B1.1 enhancement, I think it's conceded that the court didn't make findings that have anything to do with 3B1.1 when it imposed the four-point enhancement. My colleague asked this court to make a de novo review of the entire record and come up with its own reasoning as to why the 3B1.1 enhancement should apply. We submit that the better course of action is to remand this case back down to the district court so the district court can actually utilize the standards under 3B1.1 and make a determination of whether it qualifies, and if so, at which level that are grounded in the facts of the case. Unless there are any questions on that enhancement, I'd leave the balance of my time for a moment. Thank you. Thank you. May it please the court. My name is Matt Wilson. I'm here for the United States. The appellants have raised a number of issues in their briefs, but particularly what's been argued here today, I plan on addressing some of those. But in summary, there was sufficient evidence in this case to convict the defendants on all the counts, and as to the evidentiary and sentencing issues, we believe the district court made the correct rulings, and if there were any error, it was harmless. I'd like to go to the phone call first, the co-conspirator statement that Mr. Brian Bailey's counsel raised. I don't think there's any dispute under 801D2E that the conspiracy existed in this case or Mr. Brian Bailey was a member of it. I think really the only dispute- Was that decided before this conversation was put in evidence or after? I'm sorry, Your Honor? Was that decided by the court that the conspiracy had been shown at that point, or did the court decide it later? The court did decide it later as well. I don't think a particular finding was made, but the court could look to the substance of the statement itself to determine whether there was a conspiracy. But some proof had been put on at that point as to the conspiracy's existence. But Wiggins didn't testify at all? Wiggins was not a witness in the case, yes, Your Honor. And the contention is that because Ms. Wiggins was referring to past conduct, she was not making statements in furtherance of the conspiracy. Yes, Your Honor. She did make statements as to past conduct, but in doing so, she was actually describing how this conspiracy had worked to Mr. Wiggins. There was statements that how she began working with Ms. Bailey, Ms. Sandra Bailey. It's a little hard to see how the historical statements about how the conspiracy worked could be made in furtherance of the conspiracy. Yes, Your Honor. I think I cited in my brief the Henderson case, I believe, to describe how it worked, the different players involved. I think that Judge Radler brought up there was also talk about imminent and future contact between the co-conspirators, Brian Bailey. She said that she had recently tried, Ms. Wiggins had tried to contact Dr. Pressen and then was going to call Ms. Bailey, Ms. Sandra Bailey, to obtain Brian Bailey's contact information and try to get me a knee brace, I believe was the language that was used. So you think that, so that part of it you think is in furtherance of the ongoing conspiracy that she was involved in? Yes, Your Honor. I believe that could go to it as well. So there is description, ample description on her working for Mrs. Bailey. She spontaneously, not in response to Mr. Wiggins questioning about really Brian at all besides who he was, she spontaneously stated that Brian paid real good too, I believe was the language. She describes how Catherine Farmer came to work with Ms. Bailey. As far as the timing goes, I think there was evidence, there was a phone call with Ms. Catherine Farmer later in the case and evidence that Ms. Catherine Farmer was actively involved as a patient referral source for Mrs. Sandra Bailey. So I think that could all go to the timing. But Mr. Wimbush actually describes his intentions. He tells Ms. Wiggins, I'm going to find customers, going to try and find customers for and ask what Ms. Sandra Bailey will pay for that, for ten customers, I believe the language was. And Ms. Wiggins' response is, oh, about $200 or $300. So we also had evidence in the case, I referred to Catherine Farmer, that during the course of this conspiracy she had received an envelope full of money from Ms. Sandra Bailey. I think though that even if the court finds error in the admission of the call, that we're dealing with a harmless error standard here, because there was ample evidence in addition to this one call as to Brian Bailey's guilt. I've outlined that in my brief. But we had Ms. Lisa Vega's testimony about his involvement in the forging and falsifying of the forms while he was the manager at Jasmine. We had testimony from patient Judy Johns that Brian actually went to her house with his mother and forced a wheelchair upon her that she didn't need and she didn't want. We had testimony from Ms. Christine Thorpe who testified that she went to some defunct office building and met Brian Bailey, received a wheelchair where she had driven to the appointment. She was never evaluated there by Dr. Presson. And we had the testimony from Dennis Sensing and the different Mississippi witnesses that the defendant was continuing to commit this fraud in Mississippi as well as Tennessee. So we think we're dealing with a harmless error standard if the court finds error. Now as to the loss amounts, I think we could all agree that Judge Anderson had a very hard job here. But on the other hand, Judge Anderson, the district court, had sat through this whole trial with the rest of us. But I think the standard that this court, appellate courts, apply to such matters shows that and that it is an extremely deferential standard. The court, Judge Gibbons, you stated that at the time the Donadeo case had not been decided yet. And that is correct. But as to the loss amount, the district court's finding only needs to be reasonable. And that is the Mahmoud case as well as the Triana case. Reasonable in what sense? Well... We're talking about procedural reasonableness now, right? Yes, your honor. But we're also talking about what's reflected in the Martinez case where the court's decision has to be within the universe of acceptable computations. So you can see a lot of appeal, absent the Donadeo case, to thinking that we take this quite broad view because that's how we've always viewed conspiracy. Yes. Probably for the reasons I explained earlier, it's hard to discern between what you sort of expressly promoted versus things you just sort of tacitly knew were happening versus maybe things you didn't know were happening at all but you were part of the conspiracy and you knew that was a possibility. But then we have this intervening case law, which I think, would you agree, takes a different course on how to measure that, at least for the sentencing piece? There are different views. And so what do we do with that? Well, I think here the court can look at Judge Anderson's decision as it relates to the guideline as well as the Donadeo factors. I think that the Donadeo factors are actually less intensive, if that's the right term, than what's actually in the guidelines, what's actually to be found here. I think that as the six factors goes . . . You think it's not procedural error if you apply the wrong test but basically get to the same place? You're saying that the district judge would get to the same place under either test? I think he would. I think he would. Is there concern about having him just apply the right test? Well, I think he did apply the right test here. I mean, I know there was some talk about conflating the conspiracy standard with the relevant conduct standard, the 1B1.3 standard. But here I don't believe that the district court actually applied the wider net of conspiracy, if the court looks at what he did. You can't fault him for not knowing about a case that we hadn't decided. That's correct. I couldn't fault him there. But if the court looks at what Judge Anderson actually did, Calvin's exposure was actually limited where he wasn't held responsible for all of the claims in this case. What's the cutoff point where you get more time? Is it 1.5 million or is there another drop down there someplace? I believe it's 1.5 to 5 million. It might be 3.5, but 1.5 I believe is the cutoff, Judge Seiler. The court found how much here? I believe the court found 1.9. I think that's what the amount was. Is there any lower categories below 1.5? Are there other levels? Yes, sir. I don't have my guideline book because we weren't dealing with that, but I think there's various ranges because he was up in the 16 range, so I know there's probably seven or eight more below that, so that's correct. Was there a difference between Calvin's calculation number and Sandra's? Yes, substantial difference. Sandra Bailey was held accountable for all the Jasmine claims during their employment there. She was additionally held accountable for her employment at Duratec, where she was the employee of record after they left Jasmine. Calvin was not held accountable for that. There was testimony as to the Jasmine claims at the sentencing hearing that even all of the Jasmine claims were not counted. They were only counted to where Calvin was an employee during that time period and Sandra Bailey was either paying kickbacks to Cindy Mallard or the patients were not seen or didn't need the equipment. In doing so, Judge Anderson actually limited Calvin's involvement and exposure while he was employed at Jasmine. Is the gist of this though that while there may have been a narrowing process with respect to the amount of loss attributed to Calvin, the district court did not articulate how he was doing that and his recognition of the fact that the amount of loss analysis differs from the conspiracy liability determination? I don't believe there was a number of factors, but I think that in citing the 1B, 1.3 factors, the district court did make findings. I think the court followed the guidelines as to why he was applying what he did to Calvin Bailey. Exactly where is that in the sentencing transcript? I don't have that information in front of me, Your Honor. I'm looking at a quote from page ID number 5286 that seems to me that there's no differentiation. Is that where Judge Anderson is talking about the defendant being convicted of conspiracy and then he goes into the . . . ? Yes, and then he does not make the relevant conduct . . . The differentiation between that analysis and the relevant conduct analysis. Is the explicit differentiation someplace else? I'm not sure, Your Honor. I could brief that and submit that to the court. No, no. We'll find it. I wasn't sure whether you were telling us that the process, the analytical process was there without the magic words as to what the court was doing when it went through that process or whether the court did fail to identify exactly what it was doing. I think as a whole, he got it right and he reached the right decision, but the record's there and if I find some language I believe would be helpful to the court, I'll supply that to you. But looking at the factors here, the Donadeo factors, we have several factors which support Judge Anderson's findings. Calvin Bailey received $276,000 in commissions in his name. He knew that he had not sold that equipment. There was some argument in the briefs about other people selling the equipment. I believe it was in Mr. Calvin Bailey's reply brief and knowledge as to that. The other reality of this is Calvin Bailey shared a bank account with his wife, so he had to have seen a preponderant standard in sentencing, this money coming in and even going out. The other part of this is he was convicted by a jury of conspiracy and now we're dealing with findings at sentencing on a preponderant standard. So I think that Judge Anderson, in the end, got it correct. Also, I want to talk in my remaining time about the mass marketing issue. It's an interesting issue in that there doesn't seem to be a whole lot of cases out there. But we believe the ones that are out there, the Fifth Circuit cases, the Isselweil case is directly on point. The court noted, this court noted in questioning my adversaries as to the other means language of this guideline. It wasn't electronic, it wasn't Internet, it wasn't telemarketing. It doesn't sound like mass marketing in the lay sense of the word, does it? Not in the lay sense, but what the court has here is a unique proprietary marketing scheme run by Sandra Bailey. So you think she gets it because she goes from door to door? Well, she doesn't just go, Your Honor, she doesn't just go door to door. Take, for example, Laura Warren. She was a witness in the trial. She got a wheelchair from Sandra Bailey. Sandra Bailey makes the pitch, pays her some money, $900, and all of a sudden one wheelchair, two if you count her husband's, turns into 84 names. And then some of those witnesses testified in the trial, relatives of hers or associates. And the next thing you know, you've got hundreds. And so I believe as far as these small communities are concerned, the technique was very effective, probably more effective than an email or a flyer or whatever the other. You're focusing on the results as opposed to the means. I think it's. That seems to focus on the means. I forget which circuit has a case where there was only one person who was impacted by the scheme, but they said that was still mass marketing because they were using a means to reach a lot of people. It may have been a really poorly executed scheme where no one falls for it,  I mean, they could inform each other, but the fact that there were a lot of people who participated in this to me is less important than how Sandra is going about doing it. Okay. I think the means are important, but I think the means here, what made it effective. So I know that goes to the number. What kind of, oh, go ahead. I think your best argument is that in small communities, word of mouth is a pretty powerful tool of communication, similar to more commonly thought of mass marketing techniques. I would agree. Henning and Ripley and the other small communities that were mentioned here was obviously very effective, but family relationships, everything that was used by Ms. Bailey in doing this. What kind of marketing is not mass marketing then? If this is, what falls outside the line? I mean, this is a special enhancement. You're trying to target certain kinds of conduct. Presumably you don't want to sweep in every form of marketing. Sure. A true face-to-face, one-to-one sale. Certainly the number can be considered on that, but the first word in mass marketing is mass. I think that it's hard to draw a number. These all were one-on-one, right? They were just Sandra to so-and-so and then so-and-so to someone else. So they were all, right, sort of one-on-one? No, I don't believe they were. Or small groups. Well, Laura Warren, one person, 84 people. Then the helpers and Sandra Bailey herself would go out and actually sign them up for the wheelchairs. Ronnie Winbush. They weren't approaching them individually or in small groups? I didn't catch that. They weren't approaching them individually or in small groups or holding, like, teleforms where they ask people to call in or attend a mass? I mean, I thought this was really kind of relationship-based, one person knows someone else or a couple of other people. Well, there were recruiters involved, so they did have contacts with the recruiters of the patient referral services. Unfortunately, the deal would have to be closed in some way by an individual contact. But I had the impression, tell me if this is correct or not, that I guess Ms. Bailey was getting what I would call, just for lack of a better term, bundles of names all at once. She did. She got bundles of names. There's a call in the record where she directs Ronnie Winbush to give me ten people. Actually tells Mr. Winbush that Vincent already has ten names. Y'all don't be talking to each other to compartmentalize whatever this method was. So then there's 20. So it compounds itself. So I think that's what we're dealing with here, Your Honor. On that, I mean, the Isselwold case was very factually analogous. The court also had the, the Fifth Circuit had the Moscar case, if I'm pronouncing that correctly, where there was doctor sign-in cheats where the patient recruiter would actually have who referred you, and the recruiter's name would be on here to make sure the payments would be divvied out. So I think that that would all support Judge Anderson's finding here. In his reply brief, Mr. Shadd stated some guidance on this as to the mass marketing that does relate Judge Radler to the numbers. And I think the numbers, I know the court's questions about the method, but the numbers, the impact being important here. Well, the commission said so. It contemplated the application of this guideline when 2B1.1 folded in with the former 2F enhancement. At least ten, but fewer than 50. That language is there in his reply brief. So I think there is still some focus on the numbers of people involved here, the impact. In my remaining time, there was also dispute about the leadership enhancement. I think that for two reasons Judge Anderson correctly reached the application of the guideline. Under either a clear error or a de novo standard, we believe the court's decision should be upheld. I say that because there's really two ways, there's at least two ways to get there under this guideline. I believe that Judge Anderson relied on the otherwise extensive part of this when Judge Anderson reached his conclusion. But I believe that there is also additional evidence, substantial evidence in the record as to Ms. Bailey's leadership role. The record showed Ms. Bailey was a leader. She found the doctors in the case, Perry, Presson, and Dr. Chin. She was the one who paid Cindy Mallard. It was Sandra Bailey who found these referral sources who were mentioned in the trial, Vincent Farmer, Catherine Farmer, Wanda Wiggins. She directed, she had a helper. It was through Lisa Vega's testimony that she had someone who actually assisted her in the forms. She set up the Apple employment for her husband. She received higher commissions than other salespeople. The organization did involve five or more participants. I've listed at least eight on page 95 of my brief. How Judge Anderson relied on this, the case was otherwise extensive. The district court mentioned 600-plus patients that were brought forth in the trial. I think that's directly in line with the Embry case, the case I've cited where there was 150 unwitting taxpayers that could be considered. Do you think you can count all those people and not somebody who's involved in a criminal activity per se? Is the court inquiring about the participants or the otherwise extensive, counting all of them? Okay, yes. You're putting it under the otherwise extensive? I think under either way it is. But under the otherwise extensive, I think the court can consider the 600 or more patients, as the district court found. That's in line with the Embry case where there was a tax scheme where 150 taxpayers were taken advantage of but had no involvement really in the criminal activity. So I think under either way we can get there. There's two different standards. Judge Anderson mentioned the otherwise extensive and the patients, so that's a clear error standard. But this court, I know it's got the record and will be looking at it, but could conduct its own de novo review to support the finding. If the court has any other questions about this or any other issues, I'd be glad to answer them. Well, thank you for your time. We ask that the court affirm the convictions and uphold the sentences. Thank you.  The government – one point of dispute with the government is we have not conceded that Brian Bailey was a member of the conspiracy. And that was raised in our brief and I intended to raise that in my first time but just ran out of time. But I would point to the government – the transcript of the Ronnie Winn-Bush recording. The government has pointed to her desire to go to Dr. Pressen and get a knee brace. The transcript is very clear that she is going because her knee is bad. She tells Mr. Winn-Bush that Dr. Pressen told me to call Brian and he said my knee was in bad shape. So if I call, if I catch up with Brian, he'll come out here. Dr. Pressen will sign the papers saying I need one. Her statements are very clear that it is for her own medical need that she wants this. She states multiple times in the conversation that she doesn't want her knee to go bad, that she's got to keep on going because – regardless of her knee. These future statements about going to Dr. Pressen very clearly do not have the intent to further any kind of conspiracy. And to the issue of harmless error, I think something that's clear to keep in mind here is that all of the other evidence outside of this recording is all evidence – are all things that are not illegal unless you assume that Brian Bailey is a member of a conspiracy to commit Medicare fraud. His name appearing on documents, these calculations, these are all things that were a part of his job. And even the wire fraud is only an illegal act if you assume that he has – that he is a member of a conspiracy. If the court has any questions, I can answer those, but if not, thank you for your time. Thank you. If it pleases the court, there are some factual disagreements, I guess. This is not a one bank account case where all this money went into a joint account that Calvin and Sandra had together. There are multiple bank accounts. Sandra had her own bank account. There's an exhibit at the trial where Sandra – their government is – money taken out of Sandra's sole account paid over to Cindy Mallard. So that's a factual dispute. And I think it's enough at this level to say that's something that the district court needed to look at and make a finding about. And the concept in the commentary to the guideline, the relevant kind of guideline, is scope of Calvin's agreement. The scope of his agreement. What did he agree to do? And it is fuzzy because, you know, implicit, explicit, but it's still something that has to be determined. The district court did distinguish between the defendants in terms of the amounts. Well, there's a slight distinguishment, yes. You're saying it needs to be a finer – I think it's got to be a lot finer grained than just saying, well, because there's no money I can tie to Calvin on this one account. He wasn't an employee. He doesn't get tagged for that. That same analysis would lead to a very different result if it was applied consistently throughout the case. Not all the money from Jaspin went into Calvin's bank account, but Calvin got tagged for all that. And there's no finding that Calvin agreed to all of that. And that's why I say I struggle with this because what is his knowledge – the case law seems to say that, well, you can know that something's going on, but if you didn't agree to that, then that's not relevant conduct as to you, even though you're responsible, criminally liable, guilty of the whole thing. But it's a finer, counterintuitive construct from the guidelines, and the purpose, I think, is to distinguish between participants. And we do have the benefit after the sentencing of this six-factor test, which is going to be case-specific. But I think the court ought to have – I think Calvin ought to have the chance to have the district court do what the district court was supposed to do. It's not this requirement of particularized findings as to scope was not made anew by the Donatello case. It was always in the commentary. And there are cases that the Campbell case talks about it. It's just more starkly presented in the Donatello case and more specifically analyzed in the Donatello case. So that's – we're respectfully asking the court to vacate the sentence and remand the case, Your Honor, in addition to the relief requested in our brief. Thank you. Thank you. When I was in private practice, over a four-year period I probably had over 100 clients. I probably talked to another 100 potential clients during that time period. I talked to fellow attorneys that would refer cases to me and potentially refer cases to me. Clients would potentially refer people to me. Does the number of people that I talked to in using those methods, does that constitute mass marketing under this guideline? Clearly the commission didn't intend to account for conduct such as that. That is where this court needs to draw the line is what did the commission intend when it gave a two-level enhancement for cases like this? And the commission was very clear. It intended to be those types of solicitations like a one-time mass solicitation that goes out to a large number of people to try to pull in a large number of people through fraud. If you sent out flyers to everybody in the mail, say 80 people, would that be mass marketing? Well, when you say sent out flyers to everybody, you mean – Like all the Bureau of Prisons clients, maybe. Maybe. About these fraudulent operations. Yeah, but that's not what occurred here, right? If she calls them up, it's not mass marketing. This is simply a face-to-face and getting 10 referrals at a time. There has to be a line drawn at some point. So where does this court draw the line? There's a blank canvas here in the Sixth Circuit to make this decision. But I think the commission and the way the commission promulgated this guideline guides this court. Thank you. We appreciate the argument that all of you have given and we'll consider all the issues the case presents carefully. Mr. Tableman, I note that you were appointed to represent Mr. Calvin Bailey under the Criminal Justice Act. We appreciate very much your having accepted that representation and you're zealous at sea on his behalf today.